Good morning, Your Honors. My name is David Landry. I represent the petitioner, Almazbak Raiymkulov, also known as Kid Diamond. Kid Diamond was a very famous boxer from the country of Kyrgyzstan. Still very famous in boxing circles. The petitioner went through removal proceedings in custody. It's clear to the petitioner on appeal he really didn't receive a very good individual hearing. In particular, the interpretation was very poorly done. The board, I'm sorry, the IJ, the immigration judge, found many, many different reasons to find that the petitioner was non-credible. The board on review, however, only confirmed four of them. They even noted in a footnote that the IJ misread some of the testimony, that that was one of the basis for the non-credibility. The petitioners of the position, that even the four basis that the board confirmed under are also incorrect. They're based upon a misreading of the evidence and that the whole case should be remanded under the Ninth Circuit recent case in Kalulu. In Kalulu we learned in a split decision that even if on appeal it's confirmed that there's substantial evidence to support the non-credibility decision, the court can still remand the case so that the IJ can reconsider evidence that they misinterpreted. And that's a lot of what happened here in the petitioner's case. Petitioner's not conceding, however, that there was substantial evidence of non-credibility. If you look at every position by the board, every finding by the board, rather, you'll see that even the board made some mistakes. For example, the first one that the board confirmed deals with whether or not the petitioner spoke out against who is now the president of Kyrgyzstan and the police minister of Kyrgyzstan. And in his testimony, the petitioner clarifies that, yes, it's true that he did speak out probably to family members about the situation, about refusing to provide support to Japarov and Tashkev, the president and the minister of police. And he may have also inadvertently provided that same position to some young journalists that he was speaking to that he didn't realize were journalists at the time. But in his testimony, he clarifies that the word publicly is what the issue is, in that he didn't consider himself to have publicly spoken out against them, even though he agrees that, yes, it's true that he did speak out. I thought the immigration judge pointed to his wife's testimony as also contradicting what her husband had said. Well, Your Honor, the judge didn't consider the wife's statement. In fact, he found that the judge felt like it was inconsistent with what the petitioner testified. Isn't that what I just said? He cited as one of the grounds for inconsistency that her statement was contrary to what her husband was saying. Well, Your Honor, there's a lot of this record that needs to be remanded, and that's a good example of things that... Are you asking us to re-weigh credibility? I mean, it sounds like you're asking us to reconsider the evidence and conclude that there was no adverse credibility here. Yes and no. Okay. Sorry for the double speak. What part of it is yes and what part of it is no? I apologize for the double speak. Kaluuya tells us that the circuit court can review the evidence to see whether or not the board made clear error in confirming whether or not the basis upon which the non-credibility was found are accurate. And although I'm not asking this court to necessarily re-weigh that evidence, what I am asking the court to do is to look at the documents on their face and to come to the realization that the board was wrong to confirm what the IJ decided and that the documents that the IJ relied upon should not have been relied upon for credibility. We're talking right now about the corruption issue and whether or not it was publicly done. That's a point that was never addressed by the judge and was not addressed by the board. The second one... But counsel petitioner claimed that he spoke out against corruption in the Kyrgyzstan government but also argues that he never stated he spoke out publicly. So if he didn't do so publicly, how did he speak out against corruption? Well, Your Honor, the term you're referring to is part of the applicant's application for asylum. And in it he says that he's afraid to be returned both because he spoke out and also because he refused to provide support. But he does use the words speak out. You're correct. And that's why the petitioner's testimony at the individual hearing is so important because if you look at the transcript, he asks the interpreter, spoke out. Almost as if to say that he didn't say these words, but the tone was, no, I didn't speak out. And then he internalizes and expresses that, oh, yes, that I may have, like I said, spoken to family members about my position. He also notes that there's this time where he's speaking to who believe to be just young people. It still turns out to be young reporters. So it's correct to say that he did speak out in that respect and that he did speak to these people privately and he thought was speaking to privately. But it's also true that from his perspective, he didn't publicly speak out. If you notice in the transcript, he says, he repeats the word publicly, meaning he's trying to give this emphasis. Now, this brings us back to the interpretation. When you read the interpretation, the grammar is sometimes incomprehensible. It's very, very difficult to understand what it is that was being testified to and what the responses were. And that goes throughout the record. When you look at some of the other things, the statements that the petitioner made in the asylum interview, there's, I'll give you an example. The second basis for the board for the non-credibility dealt with statements that the petitioner made during his asylum interview, what they call a reasonable fear interview. And the judge finds that, no, you told the asylum officer that it was you that shut down all the businesses. But if you look at the reasonable fear interview, one of the first pages in the reasonable fear interview, the quote is, they shut down my business over there. Meaning the government shut down my business over there. And shutting down the businesses also needed some clarification, too, because the petitioner owned many businesses, not just ones in Kyrgyzstan. And he had to shut down all of his businesses, meaning he later testifies, yes, he had to shut down his business in Ukraine, he had to shut down his business in Belgium. Obviously the country, the government of Kyrgyzstan did not shut down those businesses. It's the petitioner that shut down those businesses. But the point of it is, is that the record is not clear. And I would agree with you. There's a lot of testimony in here that might on its first appear contradictory. Then follow-up questions are made, and it sometimes gets clearer, sometimes it gets even muddier. Mr. Landry, one of the things that both the board and the immigration judge pointed to was the disputed signature, and on whether or not he had a credible fear of returning. And it's pretty clear based on the credible fear interview, which apparently he signed a statement in writing, saying I don't have a fear of returning. Yeah, and then they asked him, well, isn't that your signature? And then he waffled and first denied it was his signature, and then kind of in a lawyerly fashion said, but if it was my signature, I didn't understand what I was signing. And the immigration judge basically said that's fatal to his claim, because at the hearing he testified he did have a fear. Well, I would ask you to re-review that document, particularly. So I have to decide if that's his signature? No, but my point is, no, I'm not suggesting to you that you're – I'm not asking you to determine whether or not it is his signature. We're not contesting that, okay? If he signed it, he signed it. That's fine. But when you look at the document, first of all, the petitioner doesn't speak English. He thinks he speaks English, but it's clear – But he says on 589 that he does, doesn't he? I'm not in disagreement with you that he said the words I speak English, but it's not uncommon for people from other countries to say to American immigration officials, yes, I speak that language in an attempt to ingratiate them, because that's true in many countries. For example, France. I'm giving you an example. The French people treat tourists differently unless they speak French, okay? So I discount that statement, but there is a lot of wrong in this document, and it was improper impeachment for the judge to rely upon it. First of all, the document was prepared in English. The interview says at the top they did not use an interpreter. Second, if you look at the transcript and the questioning from the officer, at no time does the officer ask him, hey, do you read English? He only ever says that he speaks English. Those are two very different things. So for the petitioner to be impeached upon a document that he never claimed he was able to read is improper. And the document itself is internally incorrect. If you look on the document, you'll see that one of the last lines it says, I have initialed each page of this statement. There are no initials on these documents. That didn't happen. So from petitioner's perspective, this was a document that should not have been used for impeachment purposes because it's inherently unreliable, and it was prepared in the language that petitioner has never acknowledged the ability to read. And we're going to say, well, then the officer read it to him and he should have understood it as it was read to him. Well, we don't know that that was read correctly. There's a lot of boilerplate in this document that may or may not have been read to the petitioner. These documents are prepared by officers really in a cursory fashion. And to impeach the petitioner on that, I think, is a violation of his due process rights. Let me just pause here. I'm going to go ahead and stop you there, but I'm going to give you two minutes for rebuttal. Thank you. Good morning, Your Honors. Christopher Pryby for the Attorney General. May it please the Court. The entirety of petitioner's argument is that he wants this Court to re-decide the standard of review. I think my timer is not going. Yeah, please start the clock. Okay. He wants this Court to review under a de novo standard of review, basically. He wants to re-weigh all of the stuff that he just listed. This is under substantial evidence standard of review. Every reasonable fact finder has to be compelled to buy his story for you to reverse. He proposes interpretations some more plausible than others of the evidence, none of which are compelling. And my brief lays all that out. A few points petitioner's made. He raises the quality of the interpretation as a potential issue. That wasn't raised before the Board. That wasn't raised in his blue brief. It's waived. It's not exhausted. This Court can't consider it. Same thing for improper impeachment. Not raised in the blue brief. Not raised before the Board. Not before this Court. He, I don't remember if he mentioned ineffective assistance of counsel, but if, to the extent that he's arguing that as well, that was not raised before the Board. It wasn't raised in his blue brief. Not before the Court. And I don't, I am not familiar with Colulu. That was not raised in a 28-J before this hearing. I would request permission to respond to his argument with Colulu.  You can file a 28-J on Colulu if you'd like. Thank you, Your Honor. Unless this Court has any further questions. Well, just so I can kind of encapsulate your argument, I take it what you're saying is that to the extent he has made an argument that's before us today, it's, we have to review that under substantial evidence standard. And you feel that there's enough there in terms of discrepancies to support the IJ's and the BIA's decision in this case. There is enough to support. At least one reasonable fact finder could agree with the agency on this case. Therefore, this Court must deny the petition for review. Thank you, Your Honor. Thank you.  Your Honor, there were two more points, or maybe one or two more points that the Board found to be supportive of a non-credibility issue. And I understand that Government Counsel is at a, hasn't read Colulu. But I would note in Colulu that Colulu was a split decision. The majority found that remand was proper. And the dissent, Judge Sanchez would have found that no, that there should be a weighing of the documentary evidence that was credible versus the weighing of the evidence that was non-credible and to consider which one weighed heavier. It's important to remember that the petitioner provided documentary evidence that showed he had an existing relationship with the current president who was then running at the time to become president of Kyrgyzstan, the same thing, with the head of the police. There's also very good evidence from the Human Rights Report that both of these persons engaged in torture, and including political rivals or persons they consider to be political rivals. And as to the credibility issues, the documents that I was discussing before, we hadn't talked about whether or not the petitioner was harmed twice or two or three times. The judge relied upon information from the asylum officer. And I would point to one of the first lines that the petitioner said, which the petitioner gives to the asylum officer in the interview, says, yes, they cut my arm. I had a scar now. They also warned me, threatened me, that they would cut my head. Now, the judge interpreted this as involving one incident, the incident where the goons come to the petitioner's restaurant, attack him with a knife, and the petitioner's hand is cut when he's defending himself. There's another incident, which the petitioner testifies to, about when goons again, at this time, I think, come to his home. They have metal rods, and they attack him. The attack results in a cut to his head. That phrase, the first line that the petitioner gives to the asylum officer, references this cut to the head. Now, I would agree it's not very artfully worded. Once again, interpretation. But clearly, that's what the petitioner, I should say, impliedly, that's what the petitioner is referring to, this second incident. In fact, it was the second incident was the same one that the judge mistakenly found that the attackers had broken petitioner's legs and permanently disabled him, where, in fact, petitioner's testimony was, they were trying to break my legs. The last basis for non-credibility dealt with what he said the border patrol officer. And the IJ finds that, oh, well, gee, petitioner must have understood what was in that document, because the petitioner has applied for visas to come to the United States and has been to the United States before. Well, one, that doesn't prove that the person can read English. We just talked about that. And the petitioner, in the interview to the asylum officer, they ask him, hey, do you speak English? He says, well, I speak it okay, because I used to speak it ten years ago when I was in the United States, but I really do need a Russian interpreter for me to better understand what's going on. So, counsel, we are over time. So if you want to wrap up, I'll give you, you know. I'll submit, Your Honor. Thank you very much. All right. Thank you very much, counsel. Thank you very much for your briefing and your argument in this case. This matter is submitted, and we are adjourned. And hopefully we can do this again. Thank you, everybody.
judges: TALLMAN, OWENS, Montenegro